UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 20-CR-181(2)(PJS)

UNITED STATES OF AMERICA,

        Plaintiff,

v.

**GOVERNMENT'S SENTENCING MEMORANDUM**

DAVON DE-ANDRE TURNER,

        Defendant.

For the following reasons, the United States recommends that Defendant Davon De-Andre Turner receive a sentence of 48 months imprisonment. The United States believes that such a sentence is sufficient, but not greater than necessary, to comport with the Section 3553(a)(2) sentencing factors.

## I.   Relevant Facts

### A. Offense Conduct

On May 25, 2020, George Floyd died while being arrested by the Minneapolis Police Department. (Presentence Investigation Report ("PSR") ¶ 10.) The nature and circumstances of Mr. Floyd's arrest, subsequent death, and the actions of the Minneapolis Police Department came under intense public scrutiny. (*Id.*) Almost immediately following Mr. Floyd's death, public protests began in Minneapolis and expanded throughout the Twin Cities metro area. (*Id.*)

Following the mostly peaceful protests that occurred on May 26, 2020, the cities of Minneapolis and St. Paul endured multiple nights of violence and destruction. (*Id.* ¶ 11.) Between May 27 and May 30, 2020, following several peaceful protests, hundreds of

individuals vandalized and looted local businesses and destroyed buildings, vehicles, and other property through arson, smashing doors and windows, and throwing objects. (*Id.*) The Minneapolis neighborhood surrounding the East Lake Street-Hiawatha intersection, near the site of the police's encounter with Mr. Floyd, was particularly hard hit, with numerous business in the neighborhood looted and partially destroyed by vandalism and arson (*Id.*) On May 27, 2020, several businesses surrounding the Third Precinct were looted, and multiple fires were set, including to an apartment complex under construction that was essentially destroyed. (*Id.*) City authorities began to discuss if the Third Precinct building should be abandoned, and vehicles, weapons, computers, and sensitive files were ultimately moved offsite. (*Id.*)

On May 28, 2020, it became clear that assistance was required. The National Guard was called on to assist in the city of Minneapolis. (PSR ¶ 12.) Throughout the day, hundreds of people remained gathered around the Third Precinct building. (*Id.*) A small handful of officers were stationed on the roof guarded the building. (*Id.*) A mobile fence had been erected around the building which was increasingly tested by the protestors as the evening went on. (*Id.*) At about 9:30 p.m., the approximately 15 to 20 officers that remained at the Third Precinct were ordered to evacuate as the crowd, which by some estimates topped 1,000 people, grew larger and more aggressive, and became increasingly uncontrollable. (*Id.*)

Shortly after 10 p.m., an individual breached the temporary fence that had been protecting the Third Precinct building. (*Id.* ¶ 14.) Soon after, many protestors followed and entered the building. (*Id.*) Rioters damaged property and set multiple fires in the building.

(*Id.*) Firefighters could not reach the building due to the large number of protestors and the violent acts of the rioters. (*Id.*) The fires were eventually extinguished the following morning. (*Id.*)

Defendant Davon Turner and co-defendant Bryce Williams were among the first individuals who approached the Third Precinct building just after 10 p.m. (PSR ¶ 16.) Surveillance video shows Williams, wearing a hooded sweatshirt and yellow cap, holding what appears to be a Molotov cocktail through the breached doorway, while an unidentified individual attempted to light the wick. (*Id.*) Turner, wearing a sweatshirt with the number "8" on the front is standing inside the doorway. Turner holds the bottle with Williams before it is handed to him, goes out, and more fuel is poured on it. (*Id.*) Turner moves out of the video's frame holding the bottle, which he then brought inside. (*Id.*)




**B. Community Impact**

Turner and his co-conspirators' conduct impacted the surrounding community, both those associated with the Third Precinct as well as community business owners and residents more broadly.

Multiple officers stationed at the Third Precinct submitted victim impact statements. They described the impact of seeing their workplace destroyed. Family members of law enforcement officers also submitted statements, like the young child that discussed the feeling of seeing her mother's place of work burn live on television while worrying about the safety of her mother. Civilian employees who worked at the Third Precinct also submitted statements. One individual, a Crime Prevention Specialist, addressed community members' concerns for high crime areas located in the precinct. He discussed the damage to the community by the loss of community programs like the Community Response Team and Neighborhood Coordination Officers, and how those in the community rely on those resources. Numerous community members also submitted statements describing the impact of the destruction of the Third Precinct. One described the impact to the community of the lack of police resources due to the Third Precinct being destroyed, including that the police are hampered in their ability to respond to crime due to the absence of the precinct building. Others discussed the defeat, despair, and fear they felt as community members witnessing firsthand the destruction to their local police precinct.

In the plea agreement, the parties agreed that the Mandatory Victims Restitution Act applies and that the total amount of restitution for the loss suffered by the Minneapolis Police Department was $12,000,000. (PSR ¶ 23.) Those costs include rebuilding or

repairing the Third Precinct building, as well as additional costs for equipment, clean up, and overtime pay for city employees in the aftermath of the arson. (*Id.* ¶ 25.)

### C. History of the Defendant

#### 1. Turner's Personal Background

Turner is 25 years old. (PSR ¶ 49.) Turner was born in Chicago and moved to Minnesota at age five, following his parents' separation. (*Id.* ¶ 49.) He grew up in a close-knit family and maintains a close relationship with his parents, siblings, and extended family. (*Id.* ¶¶ 49, 50.)

In some ways, Turner had a relatively normal childhood. He was close with his parents and siblings, attended school, and enjoyed playing sports and video games. (*Id.* ¶ 51.) At the same time, his upbringing was not without significant challenges. His mother was financially unstable, and the family lived in a family-oriented shelter for the first year after moving to Minnesota. (*Id.* ¶ 52.) Both his parents had a history of substance abuse using heroin. (*Id.*) Multiple of his siblings suffer from significant mental health challenges, and three of his brothers have significant criminal convictions, for murder, assault, and drugs. (*Id.* ¶ 49.)

Turner struggled in high school. He ultimately dropped out in the 11th grade, at the time his first child was born. (PSR ¶ 68, 51.) Turner has four young children. (*Id.* ¶ 54.) Turner is currently working on obtaining his GED. (*Id.*)

Turner was diagnosed with post-traumatic stress disorder, stemming from the deaths and murders of several friends. (PSR ¶ 61.) He is also taking an anti-depressant. (*Id.*) Turner does not appear have a drug or alcohol abuse problem. (*Id.* ¶¶ 64-67.)

5

2. **Turner's Criminal History**

Turner was convicted of Aiding and Abetting Aggravated Robbery conviction in 2014 (when he was 18 years old). (PSR ¶ 44.) Turner and two juvenile accomplices robbed a victim at gunpoint in a public park. (*Id.*) After robbing the victim, one of the three fired a pistol at the victim causing fear and panic, not only to the victim, but to other parents with children using the park. (*Id.*) Turner received a stayed 48-month sentence and probation for 5 years. (*Id.*) By all accounts, he succeeded while on supervision and was discharged without any violations in March 2020, two months before he committed the instant offense. (*Id.*) The Government concurs with the PSR that Turner's criminal history is II. (PSR ¶ 46.)

D. **Procedural History**

Turner pled guilty to a single count Indictment charging him and three co-defendants with Conspiracy to Commit Arson. (PSR ¶ 5.) In his plea agreement with the government, Turner agreed that the base offense level was 24 and no adjustments or enhancements applied. If Turner receives a 3-level reduction for acceptance of responsibility to level 21, the Guidelines range is 41 to 51 months imprisonment. (*Id.* ¶ 6.) The PSR concurs with the parties anticipated base offense level and guideline range. (*Id.* ¶ 82.) Turner also stipulated that the loss amount for purposes of restitution was $12,000,000, but the parties reserved their rights to make legal arguments about the amount of restitution to be paid by Turner.

## II. Argument

### A. Legal Background

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). "[U]nder the advisory guidelines scheme, sentencing judges are required to find sentence-enhancing facts only by a preponderance of the evidence." *United States v. Scott*, 448 F.3d 1040, 1043 (8th Cir. 2006).

"[A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall*, 552 U.S. at 49-50; 18 U.S.C. § 3553(a). The Section 3553(a) factors include "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities." 18 U.S.C. § 3553(a).

### B. The Presentence Investigation and Guidelines Calculations

The United States has reviewed the PSR prepared by the U.S. Probation Office. As noted in the PSR, the parties entered a plea agreement on September 25, 2020. Although the total offense level contemplated in the plea agreement is consistent with the PSR, the parties estimated Turner fell into Criminal History Category II. Turner did not object to the PSR.

7

The PSR concluded that, based on a total offense level of 21 and criminal history category of II, the resulting advisory Guidelines range of imprisonment is 41 to 51 months imprisonment.

**C. The Appropriate Sentence**

A careful consideration of the Section 3553(a) factors warrants a sentence of 48 months imprisonment.

> 1. **The Nature and Circumstances of the Offense and the Need for the Sentence Imposed to Reflect the Seriousness of the Offense**

Turner was part of a mob that participated in an unquestionably serious conspiracy to commit arson at a police station. He and a co-conspirator attempted to light a Molotov cocktail at the entrance of a crowded building.

However, Turner was one of only many who participated in the near total destruction of an active police station. Investigating agents identified at least 45 areas of origin where fires had been started throughout the Third Precinct building. Dozens of unidentified co-conspirators participated in setting those fires, along with looting, vandalism, and destruction of the rest of the building. From a destruction standpoint, Turner's conduct played an average (or even below average) role compared to others.

On the other hand, Turner and his co-defendant Williams were some of the first individuals to approach the Third Precinct building and attempt to start a fire. Some additional culpability is warranted for his early conduct, which likely spurred other protesters to enter the building and propagated additional arson and destruction.

In his written statement of acceptance of responsibility, Turner did not offer any remorse for his actions, only acknowledging that "he got caught up in the moment," and did

8

not go the Third Precinct with the intent to do any damage. (PSR ¶ 26.) The Government takes Turner at his word and does not have evidence to suggest that he came to the protest with the intent to commit crimes or wreak havoc.

The protests of racial injustice following the death of George Floyd and events leading up to the arsons at the Third Precinct were unprecedented. Importantly, much of the anger and pain of protesters was directly aimed at the Third Precinct – as a building and as a symbol – because all four officers associated with the death of George Floyd were stationed at the Third Precinct. That fact in no way excuses the violence or destruction aimed at the Third Precinct. It does, however, create a juxtaposition against the violence and destruction of seemingly unrelated buildings in the community, including a school, liquor stores, pawn shops, and a post office (to name but a few examples of local businesses that were looted, vandalized, set on fire, or otherwise destroyed).

Ultimately, however, the sentence imposed must reflect the unquestionably serious nature of the offense. Tuner dropped a lit Molotov cocktail into a police precinct for the purpose of lighting or accelerating a fire in the building. He participated in the near total destruction of an active police precinct that caused $12 million in damages. The neighborhoods served by the Third Precinct faced unique challenges of dealing with an increase in crime rates without a precinct to house the police force charged with protecting those neighborhoods.

In addition, the sentence should reflect the seriousness of arson, a violent felony. Turner and his co-conspirators attempted to start a fire in the entrance of the Third Precinct – with multiple people in their vicinity and an unknown number of people throughout the

building. He risked the lives of the numerous individuals inside the Third Precinct. Once a fire is started, it can spread uncontrollably and cause untold damage to people or property. This is precisely why arson is considered a violent crime. A significant sentence will reflect the serious risks to and impact on the community from the arsons committed at the Third Precinct.

### 2. The History and Characteristics of the Defendant

After divorcing his father in 2000, Turner's mother moved her family to Minneapolis from Chicago to provide a safer environment. (PSR ¶ 50.) He was raised by his mother but maintained a good relationship with his father. (*Id.*) His childhood had challenges, as his family struggled financially at times. (*Id.* ¶ 52.) His parents were likely drug abusers. (*Id.*)

Turner has four young children, two each from two separate relationships. (*Id.* ¶¶ 54, 55.)

Turner's criminal history is limited, but serious. In 2009, he (and others in a group) dropped rocks from a bridge onto passing cyclists. (PSR ¶ 42.) Two victims were hurt when hit in the head with rocks. (*Id.*) He was placed on probation for a year. (*Id.*) In 2014, Turner's criminal behavior escalated significantly. He (and accomplices) used a firearm to rob a victim in a public park, and then one of the group members fired a gun at the victim. Terrified parents and children playing in the park had to duck and run for cover. Although the conviction is five years old, it demonstrates that Turner is capable of intentional violence, particularly in a group setting, and is willing to put others at risk of harm or death. To some extent, this criminal activity foreshadows his actions on May 28, 2020, when

Turner once again was caught up in a group of people committing dangerous acts. The Court could conclude that his history of committing violent acts with a group of others undermines his claim that he "just got caught up in the moment."

Turner has no other criminal history. (PSR ¶ 45.) He promptly accepted responsibility for his wrongdoing. He met with the Government. He entered a guilty plea early and admitted his culpability.

### 3. The Need for the Sentence Imposed to Promote Respect for the Law and Afford Adequate Deterrence.

It is almost unfathomable to think that an active police precinct in the city of Minneapolis was overrun, looted, vandalized, and set on fire. This conduct represents a total breakdown of respect for the law. A significant sentence is necessary to promote respect for the law.

The sentence should have a specific deterrence effect. The sentence imposed must be tailored to prevent Turner from committing another violent crime. This is Turner's second felony conviction. Although he did well on supervision, clearly, he was not deterred enough by his stint on probation to alter his behavior. A sentence of 48 months is an escalating consequence, commensurate with Turner's escalating criminal behavior. After all, he committed this offense just months after completing a five-year period of probation. The Government believes that a significant sentence in necessary to provide specific deterrence to prevent Turner from committing another violent crime.

General deterrence is also necessary to demonstrate the importance of laws and deter future conduct. *See Ferguson v. United States*, 623 F.3d 627, 632 (8th Cir. 2010) ("Congress specifically made general deterrence an appropriate consideration . . . and [the Eighth

Circuit has] described it as 'one of the key purposes of sentencing.'") Others are more likely to be deterred from committing similar violence and destruction if they learn they will pay a stiff price for it.

A sentence of 48 months imprisonment will serve the needs of sentencing to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence.

### 4. The Need to Avoid Unwarranted Sentencing Disparities

This Court sentenced co-defendant Robinson to a 48-month term of imprisonment. His actions were like Turner's, but his criminal history was less violent. Turner certainly deserves a sentence of 48 months, and such a sentence is consistent with the other sentences the Government is seeking for co-defendants. The Government is not aware of any other cases that would create an unwarranted sentencing disparity.

### III. Conclusion

For all the above reasons, the United States respectfully requests that the Court impose a sentence of 48 months imprisonment.

Respectfully submitted,

Dated: May 3, 2021

W. ANDERS FOLK
Acting United States Attorney

/s/ *David P. Steinkamp*

BY: DAVID P. STEINKAMP
HARRY M. JACOBS
Assistant U.S. Attorneys