**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**Criminal No. 20-CR- 181 (2) (PJS/BRT)**

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **DEFENDANT'S POSITION** |
| | ) | **WITH RESPECT TO SENTENCING** |
| Davon De-Andre Turner, | ) | |
| | ) | |
| defendant. | ) | |

_____

Davon Turner, through counsel, urges this Court, the Honorable Patrick J. Schlitz, to vary below the advisory guidelines and impose a sentence of one year and a day. A sentence of a year and a day following by supervised release will be sufficient but not greater than warranted based upon the particular characteristics of Mr. Turner and his relevant conduct.

Mr. Turner and counsel do not contest the advisory guideline range, nor the criminal history category as calculated by U.S. Probation. Thus, according to the anticipated range and Probation's calculation, Turner's advisory range is 41 to 51 months. Presentence Report (PSR) at ¶ 79.

**FACTUAL BACKGROUND**

Davon Turner is 25 years old, and one of eight sons born to Debra McGee. Davon's mother had children with three men, two of whom shared the last name

Turner, but were not related to each other. Davon's siblings range in age from 22 to 48 years old. Davon is the second to youngest of the Turner children and he has a close relationship with his brothers, particularly those closest to his age. PSR at ¶ 79. Davon's parents were both heroin addicts. PSR at ¶ 52. His mother went on Methadone before his was born; his father has been clean for about eight years.

Davon spent his early years living in a dangerous neighborhood at Drexell and 53rd in Chicago. The children spent very little time outdoors because of how dangerous the area was; they were often taken to the apartment of his "grandma Bit" who was his father's aunt. Before Davon was born, his maternal grandmother died a violent death following a fight in Chicago.

Davon has a vivid recollection of a traumatic event in his childhood that occurred at a Toys R Us in Chicago when he was about four years old. PSR at ¶53. Around Christmas time, Davon went with his father to pick out gifts for the family with money his mother had provided. When he and his father approached the register to check out and pay for Christmas gifts, his father was approached by police who said his father had been caught stealing. His father protested that he had not stolen and the check out clerk also spoke up and told the police Davon's father was paying for the merchandise. Nevertheless, his father was taken into custody by police. Davon watched his father being taken to the ground and pinned down by a police officer as he was being arrested. Davon was driven by a different officer and brought separately to the police

department. There he waited for over an hour for his mother to arrive by bus and pick him up. The prized Christmas present that Davon had picked out, a Spiderman car, was dashed and Christmas was overshadowed by the trauma of his father's arrest. Daryl Turner was never charged with theft, but Davon recalls that his arrest was broadcast on television much to his horror.

In about 2000, Davon came to Minnesota to attend the wedding of his oldest brother, Jaron. At that time Jaron told their mother, who had remained in Chicago, that Davon needed to stay in Minnesota because Chicago was too dangerous. That was how Davon "moved" to Minnesota. Davon's mother and his youngest brother then joined Davon in Minnesota. Davon, his mother, and brother bounced between Jaron's home and then to shelters after his mother and Jaron had a falling out. Davon recalls living at Mary Jo's shelter on Olson Memorial Highway and attending kindergarten and first grade while living in the shelter. Eventually his mother moved the children into a duplex and struggled to keep the lights on and bills paid.

He attended elementary school at Lucy Lainey school located on 17th and Knox in Minneapolis and Anderson Elementary near Abbot Northwestern Hospital. He then went to South High School. Davon was on the honor roll from fourth grade through ninth grade.

The first traumatic death that Davon experienced was that of Adelaida Marie Sadd who was known to him as Ellie. Ellie was the girlfriend of his brother Deont'e and

3

she and Deont'e had two children together. Ellie lived with Davon, his mother and

brothers for some while and Davon viewed her as his sister. After Ellie and his brother

broke up, Ellie continued to visit the family. In 2012, Ellie came over with her daughter

and was going to take Davon and his brother with her and go swimming. Ellie realized

when she got to the Turners that she had forgotten her daughter's swimsuit at home.

She left to go pick it up and never returned. Hours passed before the police arrived at

the Turners and said Ellie had been found shot to death in her home, in front of her

daughter, by her drunk boyfriend. Her boyfriend was convicted of the homicide and did

just five years. According to Davon's mother, Ellie's death marked the beginning of some

acting out by Davon. Davon started cutting himself as a coping mechanism following

Ellie's death. PSR at ¶62.

In his sophomore year of high school, South High School experienced riots due to

clashes between Muslims and African Americans. At one point the school was closed

down for one week due to the riots. Davon's grades began to slip. He was slated to be

transferred to an alternative learning center in the 11th grade, but the new school would

not accept many of his credits. Davon dropped out of school just short 9 credits for

graduation.

From a young age, Davon worked. His first job was as a cart pusher at Wal Mart.

The store was in Bloomington and he took the bus to work. After Wal Mart, he went to

work at Foot Locker and became a trusted employee. He was an assistant manager,

given a key, and trusted to close the store at night. He worked for Foot Locker four years and left to work at Life Time Fitness. He also worked overnights at Nordstroms for about one year. After his second daughter was born, Davon stayed home to take of his daughters.

Davon was seventeen years old when his high school girlfriend, Breanna, became pregnant. Davon and Briana lived with Davon's mother until his mother kicked both he and Breanna out of the house. Briana moved back in with her mother and Davon was homeless; he slept in parks before moving in with a friend from elementary school who lived in Fridley. From Fridley he took a bus to Richfield to visit Briana. Davon and Briana stayed together for six years and have two sons together. The boys live with Briana, who does not want Davon to be a part of the boys' lives.

Davon has been in a relationship with Denisis Baldera for the past six years. They have two daughters ages four and two. His oldest daughter is named after the "sister" he lost, Ellie. Davon had been the primary caretaker for his two girls while Denisis worked at Hennepin County Medical Center. Their youngest daughter has had numerous medical issues including seizures and several hospitalizations in the recent months. Denisis missed a lot of work and lost her job. The daughters' material grandmother has been assuming a greater role helping out with childcare.

In addition to the trauma experienced from Ellie's violent death, Davon has lost other friends and family due to violence. In 2015, an acquaintance, Maurice O. Brown,

5

was fatally shot in the chest at seventeen years old. No suspects were found. In 2018

Davon's friend, Xavier Bellclair Pollard, committed suicide while incarcerated in St. Cloud

Correctional Facility. In April of 2020, a friend, Trevante Troy Byrd, was fatally shot at

age 23 while sitting in a parked car. No suspects were found. In February of this year,

Davon learned that one of his cousins was killed in Chicago, shot 13 times.

Davon has been diagnosed with post traumatic stress syndrome (PTSD)

attributable to the numerous deaths and murders he has experienced in his life. PSR at

¶61. Davon was also diagnosed with a seizure disorder in 2014. PSR at ¶59. He is

currently taking Depakote, an anti-seizure medication and Remeron, an anti-depressant.

PSR at ¶59 and ¶61.

## May 25 - 28, 2020

Protests erupted in the Twin Cities and nationwide following the widely televised

video of George Floyd, a Black man, dying under the weight of a Minneapolis police

officer, Derek Chauvin on May 25, 2020. Chauvin would eventually be convicted of

second and third degree murder and second degree manslaughter. *State v. Chauvin*,

Hennepin County Case No. 27-CR-20-12646.

The day following Floyd's murder, protests began at the intersection where Floyd

died and then moved throughout the state. The world became outraged at the

treatment of Floyd by the Minneapolis police officers. As early as May 26, 2020, the

Third Precinct of the Minneapolis Police Department became a gathering place for

protesters. All four officers involved in the arrest of Floyd had been Third Precinct

officers. PSR at ¶10. The Precinct building was the target of damages from the beginning

of the protests, first by rocks and bottles being hurled at the building. PSR at ¶11. Police

were authorized to use rubber bullets and tear gas in response to actions by protestors

and measures were taken to add protection around the building. Protestors were

injured by police which fueled the ire of those demonstrating. Davon Turner saw a

protestor get hit in the eye with a rubber bullet fired by a police officer and then taken

to Hennepin County Medical Center. Attachment 1, pp. 19-20. The rubber bullets may

have been a catalyst for rocks and bottles being thrown at the precinct.

Protests throughout Minneapolis and Saint Paul grew more and more destructive

over the days following Floyd's painful death. On May 27th, several businesses

surrounding the Third Precinct building were looted, and many buildings were set on

fire. City official discussed whether the Third Precinct should be abandoned, and

measures were taken to move vehicles, weapons, computers, and sensitive files from

the building. PSR at ¶ 11. Minneapolis Mayor Jacob Frey ordered that the Third Precinct

building be evacuated on May 28th at around 9:30 p.m.

After police officers left the Third Precinct building, protesters breached the

entrance and mayhem followed. The investigation into the destruction of the Third

Precinct building revealed damage throughout the multi- story building. Besides

damages due to smoke and fire, many rooms were looted, vandalized, littered and

furniture broken or damaged. Looters were seen on video tape breaking down gated

barriers inside the building to reach the upper floors. In total, over 45 areas were

identified where fires had been started outside and within the building. PSR at ¶ 13.

May 28, 2020 was just the third first time Davon Turner attended a protest. He

previously showed up for gatherings following the deaths of Jamar Clark and Philando

Castille, both of whom died at the hands of police. In each of the gatherings, Black Lives

Matter was a mantra of those in attendance.

On May 28th, he headed to the area of the Third Precinct of the Minneapolis

Police Department in the late afternoon dressed in a distinctive shirt with an "8 ball"

insignia. He like other protestors wore masks due to the COVID-19 pandemic. Davon

went with his younger brother to the protest but lost track of his brother in the crowd.

Davon arrived at the Precinct without signs or instruments of any sort to make a

statement or take any action. He merely wanted to be a part of an historic event.

When the police vacated the premises, at the direction of the mayor, Davon was

at the front entrance area and saw police officers driving away from the building's

parking lot. At some point a person who was standing next to Davon handed him a glass

bottle with a rag coming out of the top. The other person, who was unknown to Turner,

but now identified as Bruce Williams, lit the rag. There was no ignition, but Williams

added some liquid to the rag, and it ignited. Davon walked into the entry way of the

Precinct and dropped the bottle. As Davon explained to the ATF officers who

8

interviewed him on June 19, 2020, he got "caught up in the moment" of the protest and did not reject the incendiary device that was handed to him.

Davon's distinctive t-shirt that he wore to the protest led to an easy identification by an anonymous tipster who forwarded a different picture of Turner in the same shirt. PSR at ¶ 18.

**CHARACTERISTICS OF TURNER AND ACCEPTANCE OF RESPONSIBILITY**

Davon accepts full responsibility for his role in adding fuel, literally and figuratively, to the protest. He did not approach the Precinct headquarters with intent to be destructive. He was handed a glass bottle by a stranger and he held onto the bottle while the other individual tried to light the material attached to the bottle. Davon then walked into the already breached entryway of the Third Precinct building and dropped the bottle. He is unsure whether the bottle he dropped ignited much of a flame; he saw a lot of smoke after dropping the bottle. His participation, however, clearly contributed to the destruction and mayhem at the Third Precinct.

An AFT and an FBI agent knocked on Davon's apartment door shortly after 7:00 am on June 19th, 2020. See Attachment 1, transcript of June 19, 2020 interview of Davon Turner. A copy of the audio recording will be provided to chambers separately. When the agents entered Davon's apartment, he was immediately read his *Miranda* rights and then questioned by the agents in his living room while his two young daughters slept in another room. Davon admitted to being at the protests and identified himself in videos

9

that were shown to him. Attachment 1, pp. 6-7.

FBI Agent Beckner admitted to Davon that he could not appreciate the emotions and the sentiment of the Black community who were outraged over George Floyd's death. Beckner acknowledged to Davon that the community "felt that anger and that rage, which you can't be blamed." Attachment 1, p.3. Davon said he was mad and "very upset that happened to George Floyd." Attachment 1, p.4. Davon told the agents, "Y'all wasn't the cops that was there. Ya'll ain't the ones I would be mad at." Davon said, "y'all been cool with me, I been cool with y'all . . . That's how I am with the police." Agent Beckner said the agents were "not gonna judge [Davon] by just one moment, a couple moments of this emotional anger you're goin' through." Attachment 1, p. 5. Beckner acknowledged that Davon was mad, and angry and that throwing a bottle was likely a mistake. Beckner then told Davon, "We're trying not to judge you based off of this, those mistakes." When asked to explain the emotions that were going on, Davon said, "I don't think you guys will understand . . .." Beckner told Davon, they were trying to. Davon then said "a lotta emotions was going through." Davon further told the agents that the police had left before he had participated in the igniting of the glass bottle. Davon said he was "sure" of that fact to which Beckner said, "That's good, I mean that tells a lot about who you are . . .." Attachment 1, p.8.

Once Devon firmly established why he knew the police were gone, Agent Beckner pressed Davon, "Alright so we just got this empty building that represents, what does it

represent?" To which Davon replied, "the precinct that basically killed, killed the, killed the man on camera." Beckner then said, "nobody can blame you for those feelings you're having. I mean what, what did you wanna do to that building man? Probably a lot of things, probably the same thing a lotta people wanted to do, right?" Beckner posited, "What, what was that?" To which Davon replies, "take it down I guess." Beckner commented that many people were "feeling the same thing." Then Boyer said, "You can't be blamed for that. You wanted to take it down and destroy it. Cause that's, that precinct represented the murder of George Floyd." Attachment 1, p. 10.

When asked about the object he had in his hand, Davon said someone gave it to him and he had not come to the protest with anything. Beckner told Davon, "Well and that, and that again speaks a lot to you. Yea, I mean you didn't come with that anticipation . . . of destroying right?" Attachment 1, pp. 11-12. Davon described being handed a glass bottle, then the person who handed it to him lit the piece of cloth that was coming out of the bottle. Davon dropped the bottle inside the front glass doors (which were already broke) at the front of the precinct. Attachment 1, pp. 12-16, 22. When he dropped the bottle, it shattered and made a lot of smoke. Attachment 1, p. 17, 23.

Agent Beckner talked to Davon about the two types of people who were at the Precinct: those like Davon who had strong emotions about George Floyd's death and those that didn't care about Floyd but just wanted to be destructive. Attachment 1, p.

18. Beckner acknowledge that Davon was <u>not</u> of the later ilk and told Davon they were most interested in those people who were driven to be destructive. Attachment 1, p. 18. Beckner said to Davon, "There's you, and then there's the bad, the bad people right. The bad guys that are doing this stuff. Can you, can you help us out?" Attachment 1, p. 19.

Davon told the agents he did not know anyone else there. No one had invited him to that protest or any other that followed. Attachment 1, p. 20. In retrospect Davon said that he regretted his actions with the Molotov cocktail and acknowledged the importance of the police department. He said, if "the police officers don't feel safe over there, then how is it gonna, protect the community." Agent Beckner responded, "That's, I'm happy to hear that that's how you thought afterwards." Agent Boyer said, "That shows who you are as a person." Attachment 1, p. 22.

The agents took Davon's electronic devices and returned them shortly afterwards presumably finding no evidence of communication with others or postings regarding the protests. (The agents asked if the devices would possibly show visits to sites or direction on how to make Molotov cocktails and Davon assured them that would not be found!) Attachment 1, pp. 23-25. In the end, the agents thanked Davon for his time and his honesty which Agent Boyer said was "really rare." Attachment 1, p. 25.

The agents' comments during their interview of Davon could be interpreted in one of two ways: either they were seemingly befriending him and insincere with their comments regarding an appreciation of the anger George Floyd's killing evoked in the

12

community and within Davon; <u>or</u> the agents were genuine in expressing their impressions of Davon. Giving the agents the presumption of honesty, the agents were sincere in acknowledging Davon Turner's candor, the type of person he is and the limited part he played in the destruction of the Third Precinct.

Davon Turner did NOT:

- Contribute to 44 other incendiary origins[1];

- Bring an accelerant to the Precinct;

- Bring any objects to throw or use to mar the building;

- Wave any sign or banner maligning police generally;

- Loot or destroy offices inside the precinct;

- Take any police memorabilia from the site;

- Take photographs at the site of the protest;

- Post any pictures or rants on social media after the protest; or

- Boast or brag of his participation in the destruction of the Precinct.

Davon was contrite, accepted responsibility and acknowledged his contribution to the devastation caused to the Third Precinct building. He was honest with the federal agents who knocked on his door early one morning; he met with prosecutors and he pled early. To use the words of the federal agents, Davon's interview on June 19th spoke

---

[1] One report estimated <u>49</u> separate incendiary sites.

volumes of the type of person he is. A young man who has seen injustices visited upon African Americans by police and who was shocked, saddened, and angry at the viral posting of George Floyd's killing by members of the Third Precinct police force.

## FAIR AND REASONABLE SENTENCE

Giving due regard for the sentencing considerations outlines in Section 3553(a) of Title 18, a sentence of a year and a day for Davon Turner would be sufficient and not greater than necessary to meet sentencing goals.

(1) Nature and Circumstances of the offense

The outrage that followed the widely viewed murder of George Floyd was felt worldwide, in numbers too high to estimate. Emotions were particularly high in the city where Floyd was murdered. Protestors in Minnesota numbered well into the thousands and spanned numerous locations. Davon Turner was one of thousands who gathered at the Third Precinct police headquarters the day the building was surrendered to protesters.

Turner is a young Black man, who at a very young age, witnessed police hold his father to the ground on a false belief that his father had committed a theft. Distrust of police officers by African American males is universally accepted as greater than distrust felt by Caucasians. The Department of Justice's recently commissioned investigation into the Minneapolis Police Department was prompted by a sense of racial bias in that Department. Turner's anger over Floyd's senseless death coupled with his personal

experience witnessing his father's arrest gives his presence at the protest context. His momentary lack of judgment in contributing to the burning of the police headquarters should be balanced against his personal characteristics.

(2) Need for the sentence imposed.

Davon readily acknowledged the seriousness of his conduct to the federal agents who came to his door early one morning. He said he realized police officers need to feel safe in order to carry out their role in protecting the public. Those sentiments were not prepared for a court proceeding or with any help from a lawyer. Those were honest, heartfelt, spontaneously expressed regrets. The victim impact statements drove home the impact on many human beings many of whom were not even police officers.

Just punishment should be based on Davon's relevant conduct – which was not planned or extensive. He contributed to one out of 45 incendiary sites. Should he be punished for the sins of those who contributed to the other 44 locations where fires originated?   Many other protestors are breathing sighs of relief that they did not wear some distinctive clothing while breaching the precinct building or climbing the stair to upper offices and destroying property. The federal indictment alone serves as a deterrent to others who might have considered engaging in destructive protesting. Beyond the indictment are the consequences this court will impose.

In the last year, Davon has shown himself to be responsible, compliant on GPS monitoring and curfews. His routine after the GPS monitoring was lifted did not change.

15

He has been the primary caretaker for his two young daughters while their mother worked at HCMC. His youngest daughter has suffered several seizures in the recent months and has been hospitalized a number of times much to the great consternation of her parents. Davon has taken his daughter by bus or train to Children's Hospital due to seizures and his daughter's inability to keep food down.

(3) The Need for the Sentence to Promote Respect for the Law and Afford Adequate Deterrence.

A sentence of incarceration for a federal offense as has been advocated here will amply serve to promote respect for the law and serve as a deterrent both to Davon Turner and future protestors who, like Davon, may get caught up in the moment and the emotions. A year and a day is sufficient to communicate that message.

(4) Unwarranted sentencing disparities

Davon Turner will likely be the third of four co-defendants to be sentenced in this case. On April 28, 2021, this Court imposed a 48 month sentence upon co-defendant Robinson. Robinson, like Turner, was determined to qualify for Criminal History Category II with an advisory guidelines range of 41 – 51 months.

Turner's role in the offense was less egregious than that of Robinson whom the Government characterized as having a slightly above average role. Ecf # 158, p. 11. Robinson lit multiple objects on fire. He first lit an object that was being held by another person, then threw a flaming object toward the Third Precinct, then set fire to a pile of

16

flammable. Ecf. # 158, pp. 3-4. Turner on the other hand held one bottle that was handed to him by a stranger and dropped the bottle inside the breached doorway.

Co-defendant Wolfe, who at the time of this filing has not been sentenced, was found to have possessed numerous items taken from the Minneapolis Third Precinct. First, he was found wearing body armor, a law enforcement duty belt and carrying a baton at his place of employment. Next, a search of his residence netted several other items taken from the Precinct including a riot helmet with Minneapolis Police Department logo, a 9mm pistol magazine inside a magazine belt holder. Wolfe was reported as boasting to St. Paul Police officers of having his photo from the protest on Buzzfeed.

Finally, Turner's third co-defendant is Williams. Turner did not know William (or any of the others) but Williams is the male who handed Turner the glass bottle with a piece of cloth protruding, and William is the one that lit the cloth. Williams like Robinson contributed to more than one incendiary action. He not only handed Turner a bottle, poured fuel on it and lit it, Williams later threw a box into an existing fire outside the building. Ecf # 143 at p.3. Williams participated in an interview broadcast on Instagram and boasted of his participation in the protest and looting. Ecf # 143, at p4.

The Government characterized Williams as having an average or even below average role in the arson conspiracy but countered that Williams bore additional culpability because of his early conduct which potentially spurred on others. Ecf. # 143,

17

at p.9.

Williams, by far the most educated of the four co-defendants, was a talented athlete and came from a stable family. Ecf 3 143, at p.6. Williams, unlike Turner, brought the glass bottle, cloth, and fuel to the protest. He showed more forethought than Turner who repeatedly has said he got caught up in the moment and participated with Williams in dropping the Molotov cocktail inside the entryway.

Based upon a comparison of the relative roles in this arson conspiracy, Turner falls at the bottom and his sentence should reflect that role.

Davon has a prior conviction which places him in Criminal History Category II. The offense occurred when he was 19 years old. He was charged and pled guilty to aiding and abetting aggravated robbery. See Hennepin Co. File No. 27-CR-14-17101. Davon was with two other youth at a park when he and his companions attempted to rob another group of youths. The two young men that Davon was with had a gun and one of them fired the gun. Instead of receiving a presumptive prison sentence under state guidelines, Davon received a dispositional departure and was placed on probation for 5 years conditioned upon 365 in the Hennepin County Workhouse. Davon had a mitigating role in the offense which involved a weapon. The departure was based on a finding that Davon had accepted responsibility, played a more limited role in the offense and was amenable to probation. See Attachment 2, Plea petition and departure report from Hennepin County File No. 27-CR-14-17101.

His civil rights were restored on March 26, 2020. He had no probation violations. See Hennepin Co. File No. 27-CR-14-17101. Davon's prior conviction should not change the fact that he played the least active role of the four conspirators charged and convicted in this case.

**RESTITUTION**

The parties have agreed that the loss amount for the damage to the Third Precinct is 12 million dollars and the defense reserved the right to argue the amount owed by Turner individually. Ecf # 120 p.8. Despite seemingly mandatory restitution requirement pursuant to 18 United States Code Section 2259, proportionality and the laws of lenity would support imposition of restitution of less than twelve million dollars. A restitution order of twelve million dollars on Mr. Turner, even jointly with co-defendants, violates the Eighth Amendment's prohibition against excessive fines under the unique circumstances of this arson conspiracy.

Mr. Turner did not cause twelve million dollars of damage to the Third Precinct, nor did the four co-conspirators – who did not know each other but acted in concert – jointly cause twelve million dollars in damage. Instead, hundreds of other wrongdoers who the Government has not been able to identify contributed to the damage and destruction of the Third Precinct.

Restitution is intended to reflect not only the victim's loss but also the results of the defendant's conduct. *See Hughey v. United States,* 495 U.S. 411, 416 (1990)

In *Paroline v. United* States, 572 U.S. 434 (2014), the Supreme Court held that restitution was proper under § 2259 only to the extent the defendant's offense proximately caused a victim's losses." *Id.* at 448. Admittedly *Paroline* involved child pornography, but the extended liability which the Government argued applicable in *Paroline* was rejected by the Court. The Supreme Court observed that holding Paroline responsible for restitution based on other offenders with whom he had no contact would raise questions under the Excessive Fines Clause of the Eighth Amendment. *Id.* at 455.

Davon Turner's dropping of one lit bottle and contributing to one of 45 incendiary locations, warrants a reasonable apportionment of restitution to him. An amount of restitution in an amount of 1/1000% (based on an estimated one thousand participants) or 1/45[th] % (based upon 45 incendiary locations) of the total loss, would be fair and reasonable and not violate any constitutional clauses.

## CONCLUSION

Based on the foregoing, counsel urges this Court to vary from the advisory guideline range and impose a sentence of one year and a day, which sentence would be sufficient and not greater than necessary to punish Davon Turner for his role in the offense. Further counsel urges the Court to impose a reasonable, proportionate, and equitable amount of restitution upon Mr. Turner.

20

Date:  May 3, 2021                          Respectfully submitted,

                                            */s/ deborah ellis*
                                            Deborah Ellis
                                            101 E. Fifth Street, Suite 1500
                                            Saint Paul, Minnesota 55101
                                            deborahellis2626@gmail.com
                                            651-288-3554